# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued December 6, 2012      Decided April 19, 2013
     Reissued July 26, 2013

No. 11-1444

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, ET AL.,
PETITIONERS

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION, ET AL.,
RESPONDENTS

———

No. 11-1251

OWNER-OPERATOR INDEPENDENT DRIVERS ASSN., INC.,
PETITIONER

v.

FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION, ET AL.,
RESPONDENTS

———

On Petitions for Review of an Order of the
Federal Motor Carrier Safety Administration

———

*Barbara J. Chisholm* argued the cause for petitioners
International Brotherhood of Teamsters, et al. With her on the

briefs were *Stephen P. Berzon*, *Jonathan Weissglass*, *Diana S. Reddy*, and *Scott L. Nelson*.

*Paul D. Cullen*, *Sr.* argued the cause for petitioner Owner-Operator Independent Drivers Assn., Inc. With him on the briefs were *Joyce E. Mayers* and *Paul D. Cullen*, *Jr.*

*Michael P. Abate*, Attorney, U.S. Department of Justice, argued the cause for respondents. With him on the brief were *Tony West*, Assistant Attorney General at the time the brief was filed, *Ronald C. Machen*, *Jr.*, U.S. Attorney, *David C. Shilton*, *John L. Smeltzer*, and *Michael S. Raab*, Attorneys, *Paul M. Geier*, Assistant General Counsel, Federal Motor Carrier Safety Administration, and *Peter J. Plocki*, Deputy Assistant General Counsel.

*Randolph D. Moss* and *Brian M. Boynton* were on the brief for *amicus curiae* California Agricultural Issues Forum in support of respondents. *Seth T. Waxman* entered an appearance.

*Stephan E. Becker* and *Daron T. Carreiro* were on the brief for *amicus curiae* The United Mexican States in support of respondents.

Before: HENDERSON, ROGERS, and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH.

KAVANAUGH, *Circuit Judge*: Pursuant to statute, the Federal Motor Carrier Safety Administration recently authorized a pilot program that allows Mexico-domiciled trucking companies to operate trucks throughout the United States, so long as the trucking companies comply with certain

federal safety standards. Two groups representing American truck drivers, the Owner-Operator Independent Drivers Association and the International Brotherhood of Teamsters, contend that the pilot program is unlawful. We disagree and deny their petitions for review.

I

Before 1982, trucking companies from Canada and Mexico could apply for a permit to operate in the United States. In 1982, concerned that Canada and Mexico were not granting reciprocal access to American trucking companies, Congress passed and President Reagan signed a law that prohibited the U.S. Government from processing permits for companies domiciled in those two countries. The trucking dispute between the United States and Mexico has lingered since then.

The United States and Mexico attempted to resolve the impasse when negotiating the North American Free Trade Agreement. After NAFTA took effect in 1994, the U.S. Government announced a program that would gradually allow Mexico-domiciled trucking companies to operate throughout the United States. Soon thereafter, however, the U.S. Government announced that Mexico-domiciled trucking companies would be limited to specified commercial zones in southern border states.

Mexico then complained to a NAFTA arbitration panel about that limited access. The panel ruled that the United States had to allow Mexico-domiciled trucking companies to operate throughout the United States. But the panel also explained that the United States could require those companies to comply with the same regulations that apply to American trucking companies. The panel also ruled that if the United

States failed to allow Mexico-domiciled trucks to operate throughout the United States, Mexico would be permitted to impose retaliatory tariffs.

In response, Congress passed and President George W. Bush signed a law that authorized the Federal Motor Carrier Safety Administration, part of the Department of Transportation, to grant permits to Mexico-domiciled trucking companies so long as the trucking companies complied with U.S. safety requirements. *See* Pub. L. No. 107-87, § 350, 115 Stat. 833, 864 (2001). As the U.S. Government worked to establish a permitting regime, Congress passed and President Bush signed another law requiring the Department of Transportation to implement a pilot program to ensure that Mexico-domiciled trucks would not make the roads more dangerous. *See* U.S. Troop Readiness, Veterans' Care, Katrina Recovery, and Iraq Accountability Appropriations Act of 2007, Pub. L. No. 110-28, § 6901, 121 Stat. 112, 183 (2007).

In 2007, the FMCSA instituted a pilot program, but Congress passed and President Obama signed a law that expressly defunded the program before it was completed. *See* Omnibus Appropriations Act of 2009, Pub. L. No. 111-8, § 136, 123 Stat. 524, 932 (2009). After Mexico imposed $2.4 billion in retaliatory tariffs in response, Congress passed and President Obama signed a law reinstating funds for the program. *See generally* Consolidated Appropriations Act of 2010, Pub. L. No. 111-117, 123 Stat. 3034 (2009). In 2011, the agency again instituted a pilot program, *see* 76 Fed. Reg. 40,420 (July 8, 2011), which the Drivers Association and the Teamsters now challenge on multiple legal grounds.

II

The initial question is whether the Drivers Association and the Teamsters have standing to challenge the pilot program. The Government argues that the groups lack Article III standing, prudential standing, and organizational standing. We disagree.

To establish Article III standing, a plaintiff or petitioner must demonstrate that it has suffered injury in fact; that its injuries are fairly traceable to the allegedly unlawful conduct; and that a favorable ruling would redress its injuries. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Here, both the Drivers Association and the Teamsters have suffered an injury in fact under the doctrine of competitor standing. The competitor standing doctrine recognizes that "economic actors suffer an injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition against them." *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) (quotation marks and alteration omitted). Because the pilot program allows Mexico-domiciled trucks to compete with members of both these groups, the Drivers Association and the Teamsters have suffered an injury in fact. The causation and redressability requirements of Article III standing are easily satisfied because, absent the pilot program, members of these groups would not be subject to increased competition from Mexico-domiciled trucks operating throughout the United States.

The Drivers Association and the Teamsters also meet the prudential standing "zone of interests" test. To establish prudential standing under the zone of interests test, the groups' asserted injuries "must be arguably within the zone of interests to be protected or regulated by the statute[s]" that they allege

were violated. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012) (quotation marks omitted). As the Supreme Court recently emphasized, the prudential standing test "is not meant to be especially demanding." *Id.* (quotation marks omitted). It "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* (quotation marks omitted).

In authorizing the pilot program, Congress balanced a variety of interests, including safety, American truckers' economic well-being, foreign trade, and foreign relations. These trucking groups are plainly within the zone of interests of the statutes governing the pilot program.

Finally, the Drivers Association and the Teamsters both have organizational standing. An organization has standing to seek injunctive relief if at least one of its members would have standing and if the issue is germane to the organization's purpose. *See Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 342-43 (1977). Both groups satisfy these requirements: Their members are hurt by increased competition, and the groups exist to protect the economic interests of their members.

We therefore conclude that both groups have standing to challenge the pilot program.

## III

On the merits, we first consider the Drivers Association's arguments.

The Drivers Association advances seven distinct arguments that the pilot program violates various statutes and regulations.  We find none to be persuasive.

*First*, the Drivers Association contends that the pilot program unlawfully allows Mexico-domiciled truckers to use their Mexican commercial drivers' licenses.  The Drivers Association says that the pilot program thus violates a federal statute that provides:  "No individual shall operate a commercial motor vehicle without a valid commercial driver's license issued in accordance with section 31308."  49 U.S.C. § 31302.  Section 31308, in turn, requires the Secretary of Transportation to set "minimum uniform standards for the issuance of commercial drivers' licenses . . . *by the States*." *Id.* § 31308 (emphasis added).  The Drivers Association contends that, working together, Sections 31302 and 31308 require all truck drivers operating in the United States to have commercial drivers' licenses issued by a State, and Mexico obviously is not a state.

The relevant portions of Sections 31302 and 31308 were initially enacted in the 1990s.  *See* Transportation Equity Act for the 21st Century, Pub. L. No. 105-178, § 4011, 112 Stat. 107, 407 (1998); Pub. L. No. 103-272, § 1(d), 108 Stat. 745, 1020 (1994).  Even if Sections 31302 and 31308 alone might prohibit Mexican truckers from using their Mexican commercial drivers' licenses, two subsequent statutes made clear that Mexican commercial drivers' licenses are permissible.  A statute enacted in 2001 requires the Federal Motor Carrier Safety Administration to verify that each Mexican truck driver has the proper qualifications, "including a confirmation of the validity of the Licencia de Federal de Conductor [the Mexican-issued commercial driver's license] of each driver."  Pub. L. No. 107-87, § 350(1)(B)(viii), 115 Stat. 833, 864 (2001).  A second statute enacted in 2007

requires the Secretary of Transportation to publish "a list of Federal motor carrier safety laws and regulations, *including the commercial drivers['] license requirements*, for which the Secretary of Transportation will accept compliance with a corresponding Mexican law or regulation as the equivalent to compliance with the United States law or regulation." U.S. Troop Readiness, Veterans' Care, Katrina Recovery, and Iraq Accountability Appropriations Act of 2007, Pub. L. No. 110-28, § 6901(b)(2)(B)(v), 121 Stat. 112, 184 (2007) (emphasis added). Those two statutes – enacted in two separate public laws directly addressing the issue of Mexican trucks – reflect Congress's decision to allow Mexican truckers with Mexican commercial drivers' licenses to drive on U.S. roads.

The Drivers Association would have us find that those two laws are worthless surplusage. Reading all of the relevant statutes together, as we must, we think the more sensible conclusion is that Congress decided that Mexico-domiciled truckers with Mexican commercial drivers' licenses could drive on U.S. roads and that a Mexican commercial driver's license would be considered the essential equivalent of a state commercial driver's license for purposes of this statutory scheme. We therefore conclude that the pilot program allows Mexican truck drivers to use their Mexican-issued commercial drivers' licenses.

*Second*, the Drivers Association argues that the pilot program violates a statute governing medical certificates for truckers. Under that statute, the Secretary of Transportation must ensure that "the physical condition of operators of commercial motor vehicles is adequate to enable them to operate the vehicles safely" and that the physical exams required of truckers are performed by examiners who have received adequate training and are listed on a national registry.

*See* 49 U.S.C. §§ 31149(c)(1)(A)(i), (d). The Secretary has fulfilled that requirement by finding that issuance of a Mexican commercial driver's license, which requires a physical examination every two years, provides "proof of medical fitness to drive." 49 C.F.R. § 391.41(a)(1)(i). Moreover, the requirement that the examiner be listed on a national registry has not yet taken effect. *See* 77 Fed. Reg. 24,104, 24,105 (April 20, 2012).

*Third*, the Drivers Association contends that the pilot program violates federal regulations establishing procedures for drug testing. By regulation, all drug tests must be processed at certified laboratories. *See* 49 C.F.R. § 40.81. The Drivers Association contends that the pilot program violates this regulation because the program allows for specimens to be collected in Mexico. But nothing in the regulation prohibits collection of the specimens in foreign countries so long as they are processed at a certified lab. Because the specimens collected under the pilot program must be sent to certified labs for processing, the pilot program complies with the cited drug testing regulations.

*Fourth*, the Drivers Association claims that the three previously discussed parts of the pilot program allow Mexico-domiciled trucks to comply with Mexican law instead of U.S. law. And because trucking companies may receive a permit to operate in the United States only if they comply with applicable U.S. law, *see* 49 U.S.C. § 13902(a)(1), the Drivers Association argues that the Secretary may not grant a permit to any company participating in the pilot program. However, as we have already explained, U.S. law permits Mexican truckers to use their Mexican commercial drivers' licenses and to rely on those licenses as proof of medical fitness to drive. And the pilot program's drug-testing rules are valid under U.S. law. The pilot program therefore does not substitute compliance

with Mexican law for compliance with U.S. law; as a result, this catchall argument by the Drivers Association is unavailing.

*Fifth*, the Drivers Association asserts that the agency granted "exemptions" to Mexico-domiciled trucking companies without following the proper statutory procedures. The statutory procedures cited by the Drivers Association for granting exemptions from safety regulations are contained in subsection (b) of 49 U.S.C. § 31315. But the statute makes clear that pilot programs such as this one need not go through the separately listed procedures for exemptions. *See* 49 U.S.C. § 31315(c). Therefore, this argument fails.

*Sixth*, the Drivers Association argues that the agency failed to meet its obligation to publish a list of safety laws and regulations for which it "will accept compliance with a corresponding Mexican law or regulation as the equivalent to compliance with the United States law or regulation" and that the agency failed to explain "how the corresponding United States and Mexican laws and regulations differ." U.S. Troop Readiness, Veterans' Care, Katrina Recovery, and Iraq Accountability Appropriations Act of 2007, § 6901(b)(2)(B)(v). But the agency in fact published such an analysis in the Federal Register. *See* 76 Fed. Reg. 20,807, 20,814 (April 13, 2011). The agency therefore satisfied that requirement.

*Seventh*, the Drivers Association contends that the pilot program is not "designed to achieve a level of safety that is equivalent to, or greater than, the level of safety that would otherwise be achieved through compliance with" applicable safety laws and regulations. 49 U.S.C. § 31315(c)(2). The Drivers Association claims that the pilot program fails that requirement because it allows Mexico-domiciled truckers to

rely on their commercial drivers' licenses, accepts those licenses as proof that a driver is medically fit to drive, and includes less stringent drug-testing procedures. However, as previously explained, federal statutes, not the pilot program, enable Mexico-domiciled truckers to use their commercial drivers' licenses, and the pilot program complies with applicable U.S. drug-testing regulations. And the agency reasonably concluded that those requirements are designed to achieve an equivalent level of safety. Hence, the Drivers Association's arguments fail.

IV

Having concluded that the pilot program withstands all of the Drivers Association's challenges, we now turn to the six additional arguments advanced by the Teamsters.

*First*, the Teamsters argue that the pilot program is unlawful because not all Mexico-domiciled trucks are required to display a decal certifying that the truck complies with American safety standards. *See* 49 U.S.C. §§ 30112, 30115. But that decal requirement applies only if the trucks are "import[ed] into the United States" or are "introduce[d] . . . in interstate commerce" within the meaning of the Motor Vehicle Safety Act. 49 U.S.C. § 30112(a)(1). The agency concluded that the requirement does not apply to this class of Mexican trucks because the trucks are regularly driven into and out of the United States; they are not, in the agency's view, either imported or introduced in interstate commerce. We must uphold the agency's interpretation of "import" and "introduce . . . in interstate commerce" unless Congress has unambiguously spoken to the contrary or unless the agency's interpretation is an unreasonable interpretation of an ambiguous statutory provision. *See Chevron U.S.A. Inc. v.*

*Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984).

In our view, the agency reasonably concluded that the ordinary meaning of "import" is "to bring (wares or merchandise) into a place or country from a foreign country in the transactions of commerce." WEBSTER'S NEW INTERNATIONAL DICTIONARY SECOND EDITION 1250 (1945). That definition would apply to Mexico-domiciled trucks only if the trucks – not the items they carry – were brought into the country as commercial goods. That interpretation conforms to the longstanding rule that "vessels have been treated as *sui generis*, and subject to an entirely different set of laws and regulations from those applied to imported articles." *The Conqueror*, 166 U.S. 110, 118 (1897). Because the trucks themselves are the instrumentalities of commerce and not wares or merchandise, it was reasonable for the agency to conclude that the trucks are not imported within the meaning of this statute.

The agency also reasonably concluded that the trucks are not introduced in interstate commerce within the meaning of the Act. The Act defines "interstate commerce" as "commerce between a place in a State and a place in another State or between places in the same State through another State." 49 U.S.C. § 30102(a)(4). That definition does not include cross-border traffic between Mexico and the United States. Congress could have included foreign commerce in this definition, but it did not.

The Teamsters cite *National Association of Motor Bus Owners v. Brinegar*, where this Court interpreted a definition of interstate commerce in a different statute to include all vehicles "on a public highway upon which interstate traffic is moving." 483 F.2d 1294, 1311 (D.C. Cir. 1973) (Robinson,

J., controlling opinion). But *Brinegar* did not interpret the statute at issue in this case and did not involve foreign commerce and thus that case did not reach the question presented here. *See id.* at 1305. As a result, *Brinegar* does not foreclose the agency's interpretation of interstate commerce. In any event, even if Mexico-domiciled trucks transporting goods between the United States and Mexico are "introduce[d] . . . in interstate commerce," the safety decal requirement still does not apply to those trucks because the safety decal requirement does not apply to the "introduction or delivery for introduction in interstate commerce of a motor vehicle or motor vehicle equipment after the first purchase of the vehicle or equipment in good faith other than for resale." 49 U.S.C. § 30112(b)(1). The Mexico-domiciled trucks at issue in this case are driven into the United States to transport goods. The trucks themselves are not being resold. For that reason as well, the safety decal requirement simply does not apply to these trucks.

*Second*, the Teamsters contend that the vision tests given to Mexican truck drivers require them to recognize only the color red while American truck drivers are required to recognize red, yellow, and green. However, the Teamsters' argument is foreclosed by *International Brotherhood of Teamsters v. Peña*, where this Court upheld the determination that Mexican medical standards need not be identical to American standards. *See* 17 F.3d 1478, 1484-86 (D.C. Cir. 1994). Here, the agency adequately explained its determination that the Mexican medical standards, some of which are more stringent than the American standards, would provide a level of safety at least equivalent to the American standards taken as a whole.

*Third*, the Teamsters assert that the pilot program is unlawful because Mexico has not granted U.S.-domiciled

trucks "simultaneous and comparable authority" to operate in Mexico. *See* U.S. Troop Readiness, Veterans' Care, Katrina Recovery, and Iraq Accountability Appropriations Act of 2007, § 6901(a)(3). The Teamsters acknowledge that Mexico has granted U.S.-domiciled trucks *legal* authority to operate in Mexico, but complain that, as a practical matter, it is very difficult for American trucks to operate in Mexico. Because the statute requires Mexico to grant only legal authority to American trucks, the Teamsters' argument fails.

*Fourth*, the Teamsters argue that the pilot program impermissibly grants credit to trucking companies that participated in the 2007 pilot program. Under the relevant regulation, the agency may "grant permanent operating authority to a Mexico-domiciled carrier no earlier than 18 months after the date that provisional operating authority is granted." 49 C.F.R. § 365.507(f). The agency credits any time spent in the previous pilot program toward the 18 months required under this pilot program. The Teamsters argue that interpretation is impermissible. But the text of the regulation does not prohibit the agency from crediting a company for time that it participated in the 2007 program. We therefore cannot say that the agency's interpretation is incorrect, much less unreasonably so.

*Fifth*, the Teamsters contend that the pilot program does not include a "reasonable number of participants necessary to yield statistically valid findings." 49 U.S.C. § 31315(c)(2)(C). But this argument fails because an unlimited number of trucking companies may participate in the program. Whether Mexico-domiciled trucking companies ultimately avail themselves of the opportunity is outside the agency's control. The agency has therefore met its obligation to include a sufficient number of participants so as to yield valid results. The Teamsters also argue that the program

cannot yield statistically valid findings because it focuses on the number of inspections rather than the number of participants, and because it presumes that Mexico-domiciled trucking companies are as safe as their American counterparts. However, the Teamsters do not explain why the agency's approach is flawed, and in light of the degree of deference we give to the agency's statistical methodology, we cannot conclude that the program will yield invalid findings. *See Alaska Airlines, Inc. v. Transportation Security Administration*, 588 F.3d 1116, 1120 (D.C. Cir. 2009).

*Sixth*, the Teamsters contend that the agency violated the National Environmental Policy Act, which requires agencies to analyze the environmental impact of "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). In this case, the Act required the agency to prepare a document called an Environmental Assessment. *See* 40 C.F.R. § 1501.4(b). The agency did so.

In *Department of Transportation v. Public Citizen*, the Supreme Court held that the agency was not responsible under NEPA for evaluating the environmental effects of the President's decision to allow Mexican trucks on U.S. roads. *See* 541 U.S. 752, 765-70 (2004). The Teamsters accept that holding. But they try to argue that the agency still had discretion to restrict the pilot program so as to mitigate the environmental impacts. The Teamsters identified several alternatives the agency should have pursued. But, as the agency has explained, the short and dispositive answer to the Teamsters' argument is that the agency lacks authority to impose the alternatives proposed by the Teamsters and those alternatives would go beyond the scope of the pilot program. *See* Final Environmental Assessment of the Pilot Program on NAFTA Long-Haul Trucking Provisions, Docket No. FMCSA-2011-0097, at 6, 7-10 (Sept. 2011) (describing

agency's discretion and rejecting alternatives the agency lacks discretion to implement).

In addition, the Teamsters contend that the agency released its environmental analysis too late. An agency's analysis must be released "before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b). The Teamsters argue that the agency violated this requirement because it published its Environmental Assessment after it had already issued a final notice of intent to proceed with the pilot program. However, the Teamsters have not identified any aspect of the pilot program that the agency could have designed differently to reduce the environmental impacts, and the agency completed its Environmental Assessment before authorizing any Mexico-domiciled trucking companies to operate under the program. Any technical error was therefore harmless and not grounds for vacating or remanding. *See Nevada v. Department of Energy*, 457 F.3d 78, 90 (D.C. Cir. 2006).

\* \* \*

We deny the petitions for review.

*So ordered.*