**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

INTERNATIONAL BROTHERHOOD
OF TEAMSTERS; TEAMSTERS
JOINT COUNCIL NO. 7;
TEAMSTERS JOINT COUNCIL NO.
42; ADVOCATES FOR HIGHWAY
AND AUTO SAFETY; TRUCK
SAFETY COALITION,
                    *Petitioners*,

OWNER-OPERATOR
INDEPENDENT DRIVERS
ASSOCIATION, INC.,
                    *Intervenor*,

v.

U.S. DEPARTMENT OF
TRANSPORTATION; FEDERAL
MOTOR CARRIER SAFETY
ADMINISTRATION; ELAINE L.
CHAO, Secretary of the U.S.
Department of Transportation;
T.F. SCOTT DARLING III,
Administrator of the Federal
Motor Carrier Safety
Administration; UNITED STATES
OF AMERICA,
                    *Respondents*.

Nos. 15-70754
        16-71137
        16-71992

TRAN No.
FMCSA-2011-0097

OPINION

On Petition for Review of an Order of the
Department of Transportation, National Transportation
Safety Board

Argued and Submitted March 15, 2017
San Francisco, California

Filed June 29, 2017

Before:  Kim McLane Wardlaw, Ronald M. Gould,
and Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Wardlaw

## SUMMARY[*]

### Agency

The panel denied petitions for review challenging the Federal Motor Carrier Safety Administration's ("FMCSA") statutory authority to issue permits for U.S. long-haul operations to Mexico-domiciled trucking companies.

The panel held that the International Brotherhood of Teamsters and Intervenor Owner-Operator Independent Drivers Association, Inc. had Article III constitutional standing to challenge the FMSCA's approval of Mexico-domiciled carriers. The panel further held that the U.S. Troop Readiness, Veterans' Care, Katrina Recovery, and

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Iraq Accountability Appropriations Act of 2007 encompassed the Teamsters' and the Drivers Association's claims.  Finally, the panel held that the Teamsters and the Drivers Association also had third-party organization standing.

The panel held that it could not review the petition for review of the issuance of a Pilot Program Report because it was not a final agency action under the Administrative Procedure Act, and dismissed the petition challenging it.

The panel held that the FMSCA's grant of a long-haul operating permit to Mexico-domiciled carrier Trajosa SA de CV, and the denial of the Teamster's challenge to the permit granting Trajosa operating authority, were reviewable final agency actions.

The panel held that it had Hobbs Act jurisdiction for direct appellate review over the petitions for review of the decision to grant Trajosa a permit.  The panel held, however, that it could not review the FMSCA's decision to grant Trajosa an operating permit because the decision whether to grant long-haul authority based on the results of a pilot program is committed to agency discretion by law.

The panel held that it could not consider the Drivers Association's argument – that the FMSCA exceeded its statutory authority in granting a permit to a Mexico-domiciled carrier without requiring the carrier's drivers to first obtain a U.S. driver's license – because it was precluded by *Int'l Bhd. Of Teamsters v. U.S. Dep't of Transp.*, 724 F.3d 206, 210–11 (D.C. Cir. 2013).

**COUNSEL**

Eric Brown (argued), Barbara J. Chisholm, and Jonathan Weissglass, Altshuler Berzon LLP San Francisco, California; Henry Jasny, Advocates for Highway and Auto Safety, Washington, D.C.; for Petitioners.

Paul Cullen, Jr. (argued), Joyce E. Mayers, and Paul D. Cullen, Sr., The Cullen Law Firm PLLC, Washington, D.C., for Intervenor.

Dana Kaersvang (argued) and Michael S. Raab, Attorneys, Appellate Staff; Benjamin C. Mizer, Principal Deputy Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; Peter J. Plocki, Deputy Assistant General Counsel; Paul M. Geier, Assistant General Counsel; Molly J. Moran, Acting General Counsel; Office of the General Counsel, Office of Litigation and Enforcement, United States Department of Transportation, Washington, D.C.; Charles J. Fromm, Acting Chief Counsel, and Debra S. Straus, Office of Chief Counsel, Federal Motor Carrier Safety Administration, Washington, D.C.; for Respondents.

**OPINION**

WARDLAW, Circuit Judge:

In the latest chapter of a long-running dispute between Mexico and the United States over Mexico-domiciled trucking companies' U.S. operations, the Federal Motor Carrier Safety Administration ("FMCSA") recently began granting permits for U.S. long-haul operations to those companies, concluding that they operate at a level of safety

at least equivalent to those of U.S. and Canada-domiciled truckers.    Petitioners International Brotherhood of Teamsters, et al. ("Teamsters") and Intervenor Owner-Operator Independent Drivers Association, Inc. ("Drivers Association") challenge the FMCSA's statutory authority to issue those permits.  Because none of the parties' claims is properly before this Court, we deny the petitions for review.

## I.

The present challenge arises from a thirty-five-year-long dispute between Mexico and the United States over cross-border trucking operations.  U.S.-domiciled truckers have long opposed the entry of Mexico-domiciled truckers through both the political process and in the courts under the banner of highway safety, though their real concern appears to be preventing the increased competition threatened by the entrance of Mexico-domiciled carriers.  Most recently, U.S.-domiciled truckers represented by the Teamsters and the Drivers Association challenged the adequacy of a pilot program which Congress required the FMCSA[1] to conduct before granting long-haul operating authority to Mexico-domiciled carriers.  *See* U.S. Troop Readiness, Veterans' Care, Katrina Recovery, and Iraq Accountability Appropriations Act of 2007, Pub. L. No. 110–28, § 6901, 121 Stat. 112, 183 (2007) ("2007 Act").    This is the Teamsters' and Drivers Association's second legal challenge to that program.  The first, a challenge to the adequacy of the FMCSA's plan for conducting the program,

---

[1] The FMCSA is a branch of the Department of Transportation.  We follow the parties in describing the Department of Transportation's actions as those of the FMCSA, except where we discuss statutory obligations that fall specifically on the department itself or the Transportation Secretary.

was heard in the U.S. Court of Appeals for the D.C. Circuit. Writing for the court, Judge Kavanaugh recounted the relevant history leading up to the pilot program:

> Before 1982, trucking companies from Canada and Mexico could apply for a permit to operate in the United States. In 1982, concerned that Canada and Mexico were not granting reciprocal access to American trucking companies, Congress passed and President Reagan signed a law that prohibited the U.S. Government from processing permits for companies domiciled in those two countries. The trucking dispute between the United States and Mexico has lingered since then.

> The United States and Mexico attempted to resolve the impasse when negotiating the North American Free Trade Agreement. After NAFTA took effect in 1994, the U.S. Government announced a program that would gradually allow Mexico-domiciled trucking companies to operate throughout the United States. Soon thereafter, however, the U.S. Government announced that Mexico-domiciled trucking companies would be limited to specified commercial zones in southern border states.

> Mexico then complained to a NAFTA arbitration panel about that limited access. The panel ruled that the United States had to allow Mexico-domiciled trucking companies to operate throughout the United States. But

the panel also explained that the United States could require those companies to comply with the same regulations that apply to American trucking companies. The panel also ruled that if the United States failed to allow Mexico-domiciled trucks to operate throughout the United States, Mexico would be permitted to impose retaliatory tariffs.

In response, Congress passed and President George W. Bush signed a law that authorized the Federal Motor Carrier Safety Administration, part of the Department of Transportation, to grant permits to Mexico-domiciled trucking companies so long as the trucking companies complied with U.S. safety requirements. *See* Pub. L. No. 107–87, § 350, 115 Stat. 833, 864 (2001). As the U.S. Government worked to establish a permitting regime, Congress passed and President Bush signed another law requiring the Department of Transportation to implement a pilot program to ensure that Mexico-domiciled trucks would not make the roads more dangerous.

In 2007, the FMCSA instituted a pilot program, but Congress passed and President Obama signed a law that expressly defunded the program before it was completed. After Mexico imposed $2.4 billion in retaliatory tariffs in response, Congress passed and President Obama signed a law reinstating funds for the program. In 2011, the agency again instituted a pilot program, . . . .

*Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 724 F.3d 206, 210–11 (D.C. Cir. 2013) (*Teamsters I*) (citations omitted).

The Teamsters and the Drivers Association petitioned the D.C. Circuit to enjoin the pilot program before it began. The Teamsters argued, among other things, that the FMCSA had not planned for the "number of participants necessary to yield statistically valid findings," as required by statute, 49 U.S.C. § 31315(c)(2)(C), because it had not established a threshold for the number of trucking companies that would need to participate in the pilot program before the agency would deem the program's results statistically valid, *see* Pilot Program on the North American Free Trade Agreement (NAFTA) Long-Haul Trucking Provisions, 76 Fed. Reg. 40,420 (July 8, 2011) ("Pilot Program Plan"). *Teamsters I*, 724 F.3d at 216. The D.C. Circuit rejected this argument, holding that the FMCSA had planned for an adequate sample size by allowing "an unlimited number of trucking companies" to participate in the program. *Id.*

The Drivers Association, meanwhile, argued that the FMCSA's decision to allow Mexico-domiciled motor carriers to use Mexican driver's licenses violated other statutory requirements. *Id.* at 212–13. The D.C. Circuit rejected this contention as well, concluding that "U.S. law permits Mexican truckers to use their Mexican commercial drivers' licenses and to rely on those licenses as proof of medical fitness to drive." *Id.* at 214.

The FMCSA completed the pilot program, and in January 2015 released a report detailing its findings. FMCSA, *United States-Mexico Cross-Border Long-Haul Trucking Pilot Program Report to Congress* (2015) ("Pilot Program Report"). Only thirteen carriers participated in the pilot program. *Id.* at 2. The Department of Transportation's

Office of Inspector General reviewed the department's findings and issued its own report, concluding that thirteen drivers was too small a sample from which to draw any inferences about the safety of the entire population of Mexico-domiciled carriers expected to receive long-haul authority within the United States. Office of Inspector General, U.S. Dep't of Transp., *FMCSA Adequately Monitored Its NAFTA Cross-Border Trucking Pilot Program but Lacked a Representative Sample to Project Overall Safety Performance* 12–13 (2014).

Nevertheless, the FMCSA concluded that the data were representative, for two reasons. First, it noted that Mexican authorities and industry representatives did not expect many more carriers to apply for long-haul authority following full NAFTA implementation than the ones that had applied for provisional authority through the pilot program. Pilot Program Report at 36. Second, the FMCSA concluded that the data were representative because the agency supplemented the data it gathered from the thirteen pilot program participants with data from 952 other Mexico-owned long-haul carriers operating in the U.S. The FMCSA found that "all Mexican carrier groups performed as well as their comparison groups [of U.S. and Canada-domiciled carriers] in the majority of measures used in the study," and that "[i]n those instances where they did not, the disparity [was] generally small." *Id.* at 36.

Having analyzed the data, the FMCSA concluded that "Mexico-domiciled motor carriers[] conducting long-haul operations beyond the commercial zones of the United States[] operate at a level of safety levels [sic] that is equivalent to, or greater than, the level of safety of U.S. and Canada-domiciled motor carriers operating within the United States." *Id.* Accordingly, the FMCSA

"recommend[ed] that no significant changes be made to the Federal Motor Carrier Safety Regulations at this time." *Id.* In a letter accompanying the report, U.S. Transportation Secretary Anthony R. Foxx informed Congress that the Department of Transportation would be "taking steps to normalize acceptance of application[s] for authority from Mexico-domiciled trucking companies."

In the present petition ("*Teamsters II*"), the Teamsters challenge the FMCSA's grant of long-haul trucking authority to Mexico-domiciled carriers following the completion of the pilot program. They argue that the results of the program were based on an insufficient sample of carriers.

The Drivers Association asserts additional claims challenging the statistical validity of the FMCSA's analysis. It also reiterates its *Teamsters I* claim that the agency acted unlawfully by allowing drivers for Mexico-domiciled carriers to use Mexico-issued licenses.

## II.

We must evaluate whether the Teamsters and the Drivers Association have standing to bring this suit. Standing has a constitutional as well as a statutory component.

### A. The Teamsters and the Drivers Association have constitutional standing.

To establish that it has constitutional standing, a party must meet three requirements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). First, it must show that it has suffered an injury in fact. *Id.* at 560. Second, it must demonstrate that its injuries are fairly traceable to the

allegedly wrongful conduct. *Id.* at 561. Third, it must show that a favorable ruling would redress its injuries. *Id.*

The D.C. Circuit has recognized that "economic actors suffer an injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition against them." *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) (quotation marks and alteration omitted). This doctrine of "competitor standing" is grounded in the "'basic law of economics' that increased competition leads to actual injury." *Id.* (quoting *New World Radio, Inc. v. FCC*, 294 F.3d 164, 172 (D.C. Cir. 2002)).

In *Teamsters I*, the D.C. Circuit held that the Teamsters and the Drivers Association had properly alleged an injury in fact "[b]ecause the pilot program allows Mexico-domiciled trucks to compete with [their] members." 724 F.3d at 212. The D.C. Circuit reasoned that "[t]he causation and redressability requirements of Article III standing are easily satisfied because, absent the pilot program, members of these groups would not be subject to increased competition from Mexico-domiciled trucks operating throughout the United States." *Id.*

We agree with the D.C. Circuit that the Teamsters and the Drivers Association have constitutional standing to challenge the FMCSA's approval of Mexico-domiciled carriers. The FMCSA's grant of long-haul operating authority to Mexico-domiciled carriers has introduced new competition into the market, making it more difficult for stateside truckers to profit. This is sufficient to establish Article III injury.

The element of redressability is also easily satisfied. If we were to resolve the petitions in favor of the Teamsters and the Drivers Association and conclude that the FMCSA

exceeded its authority by granting long-haul permits to Mexico-domiciled carriers, the members of the Teamsters and the Drivers Association would face less competition from Mexico-domiciled carriers, and would thus be better off.

### B. The 2007 Act encompasses the Teamsters' and the Drivers Association's claims.

The D.C. Circuit also concluded that the Teamsters and the Drivers Association met the "zone of interests" test. *Id.* This test is often described as "prudential" standing. However, the Supreme Court recently clarified that the proper way to think about the issue is to ask "whether a legislatively conferred cause of action encompasses a particular plaintiff's claim," using "traditional tools of statutory interpretation." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, —U.S.—, 134 S. Ct. 1377, 1387 (2014).

In *Teamsters I*, the D.C. Circuit reasoned that, "In authorizing the pilot program, Congress balanced a variety of interests, including safety, American truckers' economic well-being, foreign trade, and foreign relations." 724 F.3d at 212. Thus, the court concluded that the Teamsters' and the Drivers Association's claims were "plainly within the zone of interests of the statutes governing the pilot program." *Id.* We agree with the D.C. Circuit's analysis and hold that the claims of the Teamsters and the Drivers Association fall within the 2007 Act's zone of interests.

### C. The Teamsters and the Drivers Association also have third-party organizational standing.

An organization has standing to assert the interests of its members where "(a) its members would otherwise have

standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The D.C. Circuit concluded that the Teamsters and the Drivers Association both had third-party organizational standing because "[t]heir members are hurt by increased competition, and the groups exist to protect the economic interests of their members." *Teamsters I*, 724 F.3d at 212. We agree with the D.C. Circuit on this point, as well.

"[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). Accordingly, we need not evaluate whether the Teamsters' co-petitioners have standing.

### III.

Petitioners bring their challenge under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. The APA requires courts to set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C). However, the APA does not provide for judicial review of agency action that is not final, *id.* § 704, or that is "committed to agency discretion by law," *id.* § 701(a)(2).

   A. *The grant of a long-haul operating permit to a Mexico-domiciled carrier and the denial of the Teamsters' challenge to that grant are final agency actions.*

Section 704 of the APA provides for judicial review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The Supreme Court has identified two conditions for agency action to be deemed final within the meaning of § 704. First, "the action must mark the consummation of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks omitted). Second, "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 178 (internal quotation marks omitted).

The Teamsters filed three separate petitions in this Court to ensure that they were bringing a reviewable challenge to final agency action. They filed petitions for review of the Pilot Program Report; of the FMCSA's grant of Provisional Motor Carrier Operating Authority to a particular Mexico-domiciled carrier, Trajosa SA de CV ("Trajosa"); and of the FMCSA's denial of the Teamsters' protest to Trajosa's permit application. We have consolidated all three petitions for review.

The FMCSA's grant of a long-haul operating permit to Trajosa marked the consummation of the agency's decisionmaking process to grant long-haul permits to Mexico-domiciled carriers. Legal consequences flowed from the decision, because it allowed Trajosa to operate lawfully anywhere in the United States. Thus, the issuance of the permit was final agency action.

The FMCSA's denial of the Teamsters' challenge to the permit granting Trajosa operating authority is also final agency action. The denial marked the consummation of the agency's resolution of the Teamsters' challenge, and had legal consequences because it enabled Trajosa to proceed

with its operations. *See Wind River Mining Corp. v. United States*, 946 F.2d 710, 716 (9th Cir. 1991) (rejection of administrative challenge to agency decision was final agency action).

However, the issuance of the Pilot Program Report was not final agency action. The report had no legal consequences. To be sure, it was the final step in completing the pilot program, clearing the way for the permitting of Mexico-domiciled carriers. But the submission of the report did not change the legal situation, because the FMCSA maintained discretion over whether or not to begin issuing permits to Mexico-domiciled carriers. *See* 2007 Act § 6901(a). In other words, the FMCSA could have lawfully declined to issue permits *despite* completing the pilot program. Therefore, we may not review the Pilot Program Report, and must dismiss the petition challenging it.

However, that the issuance of the Pilot Program Report was not final agency action does not affect our review of the Teamsters' and the Drivers Association's claims, because the substance of those claims is identical across the three petitions. Accordingly, we proceed to evaluate those claims, as raised in the Teamsters' other two petitions.

B. *We have Hobbs Act jurisdiction over the petition for review of the decision to grant Trajosa a permit.*

Ordinarily, a party must file a petition for review in the district court in the first instance. However, the Hobbs Act provides for direct appellate review of "rules, regulations, or final orders" of the Transportation Secretary. 28 U.S.C. § 2342(3)(A). The FMCSA concedes that the Hobbs Act provides for jurisdiction over the grant of operating authority to Trajosa. That grant was plainly a "final order" within the meaning of § 2342(3)(A). *See Carpenter v. Dep't of*

*Transp.*, 13 F.3d 313, 317 (9th Cir. 1994). Thus, we may review the Teamsters' and the Drivers Association's claims in the first instance.

C. *Whether to grant long-haul authority based on the results of the pilot program is "committed to agency discretion by law" and is thus unreviewable.*

As in *Teamsters I,* the parties' challenge here is grounded in the 2007 Act's requirement that the FMCSA conduct a pilot program before granting long-haul operating authority to Mexico-domiciled carriers:

> (a) Hereafter, funds limited or appropriated for the Department of Transportation may be obligated or expended to grant authority to a Mexico-domiciled motor carrier to operate beyond United States municipalities and commercial zones on the United States-Mexico border only to the extent that—
>
> > (1) granting such authority is first tested as part of a pilot program;
> >
> > (2) such pilot program complies with the requirements of section 350 of Public Law 107–87 and the requirements of section 31315(c) of title 49, United States Code, related to pilot programs; and
> >
> > (3) simultaneous and comparable authority to operate within Mexico is made available to motor carriers domiciled in the United States.

2007 Act § 6901(a).

This statutory language is straightforward. Section 6901(a)(1) requires the Secretary to conduct a "test" of the Department of Transportation's authority to issue long-haul permits. In turn, § 6901(a)(2) explains that a "test" is only valid if it complies with two other statutes: the law passed by Congress and signed by President Bush in 2001 that sets out the substantive safety requirements for Mexico-domiciled carriers conducting long-haul operations in the United States, Pub. L. No. 107–87, § 350, 115 Stat. 833, 864 (2001) ("2001 Act"); and 49 U.S.C. § 31315(c), which establishes general requirements with which all pilot programs conducted by the Department of Transportation must comply.

The Teamsters argue that the FMCSA's conclusion in the Pilot Program Report that Mexico-domiciled carriers would operate safely was unsupported by the data the agency collected through the program, because it relied on too small a sample. Thus, the Teamsters reason, the FMCSA lacked authority to finalize the pilot program and grant Trajosa an operating permit.

However, the source of the requirement that the pilot program "test" result in data that meet some statutorily unarticulated threshold of statistical validity is unclear. Apart from the requirements in § 6901(a)(2), § 6901(a) imposes no express requirements on the pilot program "test." Nor do any other provisions of the 2007 Act mandate a particular level of statistical significance in the data generated through the pilot program. By its express terms, § 6901(b) imposes reporting requirements that apply only "[p]rior to the initiation of the pilot program." 2007 Act § 6901(b) (emphasis added). And § 6901(c) only imposes reporting requirements on the Inspector General of the Department of Transportation. It does not require the

Transportation Secretary to take any action in response to the report. Given that § 6901(a)(2) expressly describes the substantive requirements with which the Secretary must comply in conducting the pilot program, we reject the Teamsters' invitation to find an implied requirement of statistical validity in the 2007 Act's other provisions.

Accordingly, if the 2007 Act imposes any such requirement on the results of the pilot program, this requirement would be found in either the 2001 Act or 49 U.S.C. § 31315(c), the two statutes cited in § 6901(a)(2) of the 2007 Act. The Teamsters do not argue that the 2001 Act imposes any requirements relevant here. However, they do find a requirement of statistical validity in 49 U.S.C. § 31315(c)(2), the same provision under which they challenged the pilot program plan:

> (2)     . . . The Secretary shall include, at a minimum, the following elements in each pilot program plan: . . . (C) A reasonable number of participants necessary to yield statistically valid findings.

49 U.S.C. § 31315(c)(2).

The plain language of § 31315(c)(2) forecloses the Teamsters' contention that this provision imposes a requirement of statistical validity on the data yielded by the pilot program. By its express terms, § 31315(c)(2) applies to "pilot program plan[s]." *Id.* § 31315(c)(2). If Congress had wanted the statute to apply to "results" in addition to "plans," it would have said so. We need look no further than the statute's plain language to arrive at this conclusion.

We thus reject the Teamsters' argument that the 2007 Act imposes any requirements of sample size or statistical

validity on the pilot program's results before the FMCSA may make its decision.  The 2007 Act entrusts the Secretary with evaluating the results of the pilot program and deciding whether to grant long-haul authority to Mexico-domiciled carriers in light of those results.  In other words, the 2007 Act commits these decisions to the Secretary's discretion, and the Secretary may include as the basis for its ultimate decision other relevant and logical factors, as it did here.

Agency action "committed to agency discretion by law" is exempt from APA review.  5 U.S.C. § 701(a)(2); *Heckler v. Chaney*, 470 U.S. 821, 830–31 (1985).  This exemption applies where "[a] statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *Heckler*, 470 U.S. at 830.  A statute need not expressly preclude review for the agency's action to be "committed to agency discretion."  33 Charles Alan Wright & Charles H. Koch, Jr., Federal Practice & Procedure § 8392 (1st ed. 2017).  Rather, the statute may simply leave nothing for the courts to review, vesting all authority to the agency.  *Id.*

The 2007 Act provides "no meaningful standard against which to judge the agency's exercise of discretion" in interpreting the data generated through the pilot program and granting long-haul operating permits to Mexico-domiciled carriers.  *Heckler*, 470 U.S. at 830.  Accordingly, the FMCSA's decision to grant Trajosa a long-haul operating permit is "committed to agency discretion by law," *id.* at 835, and is exempt from our review.

The Teamsters and the Drivers Association maintain that we could still find the FMCSA's decision "arbitrary and capricious" in violation of APA § 706(2)(A).  However, arbitrary and capricious review does not apply in the absence of a statutory benchmark against which to measure an

agency's exercise of discretion.    "[I]f no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion.'" *Heckler*, 470 U.S. at 830; *see also Or. Nat. Res. Council v. Thomas*, 92 F.3d 792, 798–99 (9th Cir. 1996) ("[W]here there is no law to apply for purposes of section 701(a)(2), it is legally irrelevant whether an agency has made a 'finding' that is 'contrary to the evidence before it' or that's 'so implausible that it couldn't be ascribed to a difference in view or the product of agency expertise.'" (quoting *Motor Vehicles Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983))).

Accordingly, we may not review the FMCSA's decision to grant Trajosa an operating permit.[2]

## IV.

The Drivers Association suggests a second reason why the FCMSA's grant of a long-haul permit to a Mexico-domiciled carrier violates the APA.  It contends that the FMCSA exceeded its statutory authority in granting a permit to a Mexico-domiciled carrier without requiring the carrier's drivers to first obtain a U.S. driver's license.  However, we may not consider this argument, either, for it is precluded by *Teamsters I.*

---

[2] Because we lack jurisdiction to review claims based on the statistical foundation for the FMCSA's decision to grant Mexico-domiciled carriers long-haul operating authority, we also reject the Drivers Association's claim that the FMCSA's refusal to supplement the administrative record with additional statistical information was arbitrary and capricious.  In a separately filed order, we deny the Drivers Association's motion as moot.

"The preclusive effect of a federal-court judgment is determined by federal common law." *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008). Under federal common law, issue preclusion "bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to [a] prior judgment, even if the issue recurs in the context of a different claim." *Id.* at 892 (internal quotation marks omitted).

*Teamsters I* rejected on the merits the Drivers Asssociation's claim that the FMCSA lacked authority to allow foreign carriers to operate without U.S. driver's licenses. That decision was essential to the court's decision to deny relief. The Drivers Association contends that the issues in the two suits are different because the *Teamsters I* court only reviewed whether American driver's licenses were required in the specific context of the pilot program. However, nothing in the *Teamsters I* opinion suggests that its decision was so limited. The D.C. Circuit's conclusion was simple and unambiguous: Congress had decided "to allow Mexican truckers with Mexican commercial drivers' licenses to drive on U.S. roads." *Teamsters I*, 724 F.3d at 213. Accordingly, the issues are identical, and the Drivers Association may not raise the same argument here.

## V.

The parties do not raise any arguments the merits of which we may review.

**PETITIONS DENIED.**