**Arthur David CLIFFORD,
et al., Appellants**

v.

**Federico F. PEÑA, Secretary, United States Department of Transportation, et al., Appellees.**

**Nos. 95–5238, 95–5239 and 95–5240.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 12, 1996.

Decided March 15, 1996.

---

Ernest A. Cohen argued the cause for appellants. With him on the briefs were Richard S. Zuckerman, Leslie H. Wiesenfelder, Washington, DC, and J. Patrick Morris, Cleveland, OH. Edward M. Gleason, Jr., Sterling, VA entered an appearance.

Steve Frank, Attorney, U.S. Department of Justice, argued the cause for the federal appellees. With him on the brief were Frank W. Hunger, Assistant Attorney General, Douglas N. Letter, Litigation Counsel, and Eric H. Holder, Jr., United States Attorney, Washington, DC.

Robert T. Basseches, argued the cause for appellee American President Lines, Ltd. With him on the brief were John T. Rich and I. Michael Greenberger, Washington, DC.

Before: SENTELLE, RANDOLPH, and ROGERS, Circuit Judges.

Opinion for the court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

Three labor unions challenged the decision of the United States Maritime Administration permitting American President Lines, Ltd., to operate six new foreign-built vessels under foreign flag in its existing international shipping operations. The district court consolidated the actions and, on summary judgment, ruled in favor of the Maritime Administration and the company. In this appeal the unions dispute the Administration's authority to grant the "waiver" under § 804(b) of the Merchant Marine Act of 1936, 46 U.S.C. app. § 1222(b), and claim that in doing so, the Administration violated the Administrative Procedure Act, failed to give an adequate explanation of its decision and improperly supplemented the administrative record. The government not only opposes these contentions, but also challenges the unions' standing to sue and claims that in any event a court may not review the Administration's decision to grant a § 804(b) waiver.

I

Within a few years, ships built in America and manned by American crews are expected to disappear from international commerce. For most of this century, foreign shipyards have been charging considerably less than American shipyards; and the wages and benefits paid to foreign crews have been significantly lower than those paid to American crews. The federal government had been making up the difference through grant and loan programs. The Merchant Marine Act of 1936, 46 U.S.C. app. §§ 1101–1295g, provided domestic shipowners with a construction-differential subsidy—a CDS—in order to stimulate shipbuilding in American shipyards, and an operating-differential subsidy—an ODS—to offset the higher costs of using American crews. *See Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 573–76, 100 S.Ct. 800, 801–03, 63 L.Ed.2d 36 (1980). ODS contracts between ship operators and the

Maritime Administration have terms of up to 20 years, and are generally limited to ships not more than 25 years old. 46 U.S.C. app. § 1175. In return for the subsidies, the operator must register the vessel under the U.S. flag; man the ship with an American crew; and not own or operate "any foreign-flag vessel which competes with any American-flag service determined ... to be essential" (46 U.S.C. app. § 1222(a)).

In 1981, President Reagan eliminated all funding for CDS and placed a moratorium on the awarding of new ODS contracts, policies continued to this day. As a result, no liners to be used in foreign commerce are currently being constructed in American shipyards; many ODS-subsidized ships now in operation are nearing the end of their useful lives; and ODS commitments making it economically feasible to man vessels with American crews are set to terminate—the last liner ODS contract will expire in 1998, the last bulk carrier ODS contract in 2001. The net effect is that if obsolete American-flag vessels are to be replaced at all, they will be replaced by foreign-built vessels, which are ineligible for ODS subsidies.

In 1993, American President Lines— "APL"—was operating 19 American-flag containerships on essential-service trade routes between Pacific coast ports in this country and Asia under an ODS contract due to expire on December 31, 1997. Before the expiration date, at least four of the company's subsidized vessels will have reached 25 years of age, the maximum ODS subsidy age. To remain competitive in the international shipping market, APL had to replace these vessels, which it described as too small and too expensive to operate. And so in July 1993, APL filed an application with the Maritime Administration requesting permission to operate six new foreign-flag vessels then under construction in foreign shipyards.

Acting pursuant to § 804(b) and finding "special circumstances" and "good cause," the Administration granted APL's application in 1994, on condition that, among other things, the company make the vessels available in case of a national emergency; that it not use any ODS payment for the benefit of any foreign interest; that it not scrap or reflag any of its existing American-flag vessels until October 1, 1995, and thereafter only with the Administration's permission; and that APL shall offer its new ships for inclusion in a new maritime support program if Congress enacts one.

Shortly before oral argument, APL informed us of some further developments. After the district court's decision upholding the grant of the waiver, the Administration approved APL's sale of six of its American-flag vessels to Matson Navigation Company, Inc. (an American-flag carrier engaged in the domestic trades) and reduced APL's minimum sailing requirements for its Pacific trade routes. APL had planned to replace five of its existing vessels with the new foreign-built ships the Administration authorized it to operate. Three of the ships sold to Matson were, according to APL, among the five destined for replacement. Of the remaining two, one did not belong to APL and will be returned to its owner when the charter expires on July 1, 1996. APL represents that it intends to operate the other vessel with an American crew through 1996 and possibly through 1997.

II

A

■ The government raises two preliminary issues. The first, dealing with the unions' standing to challenge the Maritime Administration's decision, is put to rest by *Autolog Corp. v. Regan*, 731 F.2d 25, 31 (D.C.Cir.1984). In ruling that a maritime union had standing to seek an injunction against a foreign carrier in order to prevent it from servicing a route reserved for American-flag vessels, we held in *Autolog* that the potential loss of American jobs was a sufficient injury to confer standing, that the injury was traceable to the foreign carrier's expansion, and that an injunction would redress the injury. The unions face the same sort of injury here. Overturning the Administration's decision is a necessary step in forestalling APL's replacement of its vessel with a foreign ship manned by foreign workers. To be sure, the unions would not wind up with much redress: APL's op-

erating differential subsidy contract expires on December 31, 1997, unless Congress intervenes. But the limited nature of the relief does not destroy the unions' standing to seek it.

■ The second preliminary question is whether, as the government contends, Administration orders granting § 804(b) waivers are unreviewable because they are "committed to agency discretion by law" (5 U.S.C. § 701(a)(2)), and hence there is "no law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971). The words of the statute appear unrestricted and undefined—"Under special circumstances and for good cause shown, the Secretary of Transportation may, in his discretion, waive the provisions of subsection (a) . . . as to any contractor, for a specific period of time" (46 U.S.C. app. § 1222(b))—but over the years the Maritime Administration has supplied a list of factors to guide its § 804(b) judgment. *See, e.g., Certain Bulk Operators,* 25 Shipping Reg. (P & F) 1261, 1264 (Mar.Admin.1990). The agency's policies have thus provided standards rendering what might arguably be unreviewable agency action reviewable. *See Padula v. Webster,* 822 F.2d 97, 100 (D.C.Cir.1987). Our judgment in this regard is not inconsistent with *Crowley Caribbean Transport, Inc. v. Peña,* 37 F.3d 671 (D.C.Cir.1994). We there declined to review the Maritime Administration's determination that a § 804(b) waiver was unnecessary because this either was an advisory agency opinion, in which event no concrete injury existed, or it was an agency decision not to prosecute, in which event *Heckler v. Chaney,* 470 U.S. 821, 832, 105 S.Ct. 1649, 1656, 84 L.Ed.2d 714 (1985), precluded judicial review.

B

■ This brings us to the unions' claim that granting the waiver to APL was arbitrary and capricious. The Administration views § 804(b) as authorizing it to exercise discretion consistent with the policies of the Act, weighing the "benefits to be gained by allowing the [use of foreign-flag vessels] . . . against the detriment to the competing U.S.-flag services which would result there-

from . . . ." *Waterman Steamship Corp.,* 16 Shipping Reg. (P & F) 1243, 1253 (Mar. Admin.1976). The unions do not take issue with this general statement. Their complaint is that allowing APL to replace American-flag vessels with foreign-flag vessels is contrary to the Act's policy, set forth in 46 U.S.C. app. § 1101, of promoting a merchant marine "owned and operated under the United States flag by citizens of the United States insofar as may be practicable, . . . and manned with a trained and efficient citizen personnel . . . ."

While the objective the union identifies is plainly one of the Act's objectives, it is far from the only one. The district court found the Act's goals "multiple and competing." *Seafarers Int'l Union v. United States,* 891 F.Supp. 641, 646 (D.D.C.1995). This is undoubtedly an accurate depiction even if one confined attention to the declaration of policy in § 1101. The declaration specifies several goals:

> It is necessary for the national defense and development of its foreign and domestic commerce that the United States shall have a merchant marine (a) sufficient to carry its domestic water-borne commerce and a substantial portion of the water-borne export and import foreign commerce of the United States and to provide shipping service essential for maintaining the flow of such domestic and foreign water-borne commerce at all times, (b) capable of serving as a naval and military auxiliary in time of war or national emergency, (c) owned and operated under the United States flag by citizens of the United States, insofar as may be practicable, (d) composed of the best-equipped, safest, and most suitable types of vessels, constructed in the United States and manned with a trained and efficient citizen personnel, and (e) supplemented by efficient facilities for shipbuilding and ship repair.

It is apparent that the Maritime Administration might not be able to achieve everything in this list at any given moment. How much it can achieve has to depend on economic conditions. *See Independent U.S. Tanker Owners Comm. v. Dole,* 809 F.2d 847, 854 n. 4 (D.C.Cir.), *cert. denied,* 484 U.S. 819, 108

S.Ct. 76, 98 L.Ed.2d 39 (1987); *Independent U.S. Tanker Owners Comm. v. Skinner*, 884 F.2d 587, 594 (D.C.Cir.1989), *cert. denied*, 495 U.S. 904, 110 S.Ct. 1922, 109 L.Ed.2d 286 (1990).

A § 804(b) waiver relieves an operator of the restrictions imposed under § 804(a), the provision barring the operation of foreign-flag vessels competing with American-flag vessels in essential services. We must assume that § 804(a) implements at least some of the objectives set forth in § 1101. And yet we must also assume that requiring strict adherence to § 804(a) could turn out to be counterproductive. Otherwise Congress would have had no reason to enact § 804(b). It therefore does no good for the union to complain that the waiver granted to APL will not accomplish everything the Act set out to achieve, or that permitting APL to operate foreign-flag ships will contradict some of § 1101's objectives. Any waiver of a statutory restriction will, by definition, allow something otherwise forbidden.

In order to grant APL's request, the Maritime Administration had to find "special circumstances" and "good cause." The agency did not, indeed could not, close its eyes to the impending demise of the subsidy programs, which by anyone's account represented a "special circumstance," certainly one not contemplated by the 1936 Congress. This development forced APL to look elsewhere for new ships. Enabling APL to remain a viable competitor was "good cause." The Administration believed, and the record supports its view, that a waiver would accomplish that end. The conditions the Administration placed on the waiver ensured that APL's new ships would be in American hands, available for use in a national emergency and, possibly, available for inclusion in a new program permitting reflagging. The Administration acted consistently with its prior § 804(b) decisions, applying the agency's long-standing criteria. The district court thoroughly reviewed this aspect of the agency's reasoning and we see no need to repeat that discussion. *See* 891 F.Supp. at 646. None of the Administration's previous waiver decisions, which the unions describe as designed to expand American-flag operations, were made during the sort of economic crisis now facing an industry on the brink of collapse. With the entire subsidy program about to end and the continued existence of any American-flag service in doubt, the Maritime Administration did what it could to minimize the impact on American labor and to retain some American control over international shipping. The Administration acted consistently with the policies set forth in § 1101. APL's new ships remain available for service in times of emergencies (§ 1101(b)), they are owned by an American company (§ 1101(c)), the company's viability is enhanced (§ 1101(c)), and American citizens will continue crewing the other vessels in APL's fleet (§ 1101(d)).

The unions have several other contentions about the adequacy of the administrative record, and the Administration's failure to explain why it did not impose different conditions on APL. The district court correctly determined that these arguments were not made before the agency and therefore would not be considered on judicial review (891 F.Supp. at 649–50). *See, e.g., Natural Resources Defense Council, Inc. v. EPA*, 25 F.3d 1063, 1073 (D.C.Cir.1994). The unions' separate argument that the district court improperly permitted the agency to supplement the record with a declaration made by Edmond J. Fitzgerald, the Director of Maritime Administration's Office of Subsidy and Insurance, also fails. Fitzgerald offered his declaration to provide the court with background information about the subsidy program and the current state of the American shipping industry, information underlying the Maritime Administration's decision and well known to the agency and to the parties. We agree with the district court that there is nothing improper in receiving declarations that " 'merely illuminate[ ] reasons obscured but implicit in the administrative record.' " 891 F.Supp. at 647 (quoting *Appeal of Bolden*, 848 F.2d 201, 207 (D.C.Cir.1988)); *see also Camp v. Pitts*, 411 U.S. 138, 141–43, 93 S.Ct. 1241, 1243–44, 36 L.Ed.2d 106 (1973).

*Affirmed.*