# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 23, 2018      Decided May 11, 2018

No. 17-1012

AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, ET AL.,
PETITIONERS

v.

ELAINE L. CHAO, SECRETARY OF THE UNITED STATES
DEPARTMENT OF TRANSPORTATION,
RESPONDENT

NORWEGIAN AIR INTERNATIONAL LIMITED,
INTERVENOR

On Petition for Review of an Order of the
United States Department of Transportation

*R. Russell Bailey* argued the cause for petitioners. With him on the briefs were *Jonathan A. Cohen*, *David M. Semanchik*, *Edward J. Gilmartin*, *James P. Clark*, *Jonathan Elifson*, and *Stella Dulanya*.

*Sharon Swingle*, Attorney, U.S. Department of Justice, argued the cause for respondent. With her on the brief was *Michael S. Raab*, Attorney.

*Thomas G. Allen* and *Kevin M. Fong* were on the brief for intervenor Norwegian Air International Limited in support of respondent.

Before: ROGERS and TATEL, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Concurring opinion filed by *Circuit Judge* ROGERS.

Concurring opinion filed by *Senior Circuit Judge* SENTELLE.

TATEL, *Circuit Judge*: Four airline-employee unions challenge the Secretary of Transportation's award of a foreign air carrier permit to Norwegian Air International Limited, arguing that the airline's business model and labor practices are not in the public interest. Though the unions have Article III standing to challenge the Secretary's decision, their petition fails on the merits as neither federal law nor international agreement requires the Secretary to deny a permit on freestanding public-interest grounds where, as here, an applicant satisfies the requirements for obtaining a permit.

## I.

A foreign airline seeking to fly to or from the United States must secure a permit from the Secretary of Transportation. *See* 49 U.S.C. § 41301. The Secretary is authorized by 49 U.S.C. § 41302 to issue a permit where an applicant is "fit, willing, and able," and either (A) "is qualified, and has been designated" to provide the air service by its home country under an international agreement or (B) will provide service that is in the "public interest." We shall explore the text of this

provision and, in particular, its public-interest component much more closely below.

The Air Transport Agreement between the United States and the European Union countries also governs issuance of permits to those nations' airlines. *See* Air Transport Agreement, June 16–21, 2011, 2011 O.J. (L 283) 3 (incorporating an earlier version of the Agreement, *see* Air Transport Agreement Between the United States and the European Community and Its Member States, Apr. 25–30, 2007, 46 I.L.M. 470 ("2007 Agreement"), and its subsequent amendment, *see* Protocol to Amend the Air Transport Agreement Between the United States of America and the European Community and Its Member States, June 24, 2010, 2010 O.J. (L 223) 3 ("2010 Protocol")). Article 4 requires that the United States grant a permit to a covered European carrier "with minimum procedural delay," provided the applicant satisfies certain citizenship and fitness criteria and maintains safety and security requirements detailed elsewhere. 2007 Agreement art. 4. Under Article 6 *bis*—"*bis*" means "second" and describes a new provision inserted after an existing one— the United States must, absent "specific reason for concern," recognize fitness and citizenship determinations made by an airline's home nation "as if such a determination had been made by its own aeronautical authorities." 2010 Protocol art. 2 (adding Article 6 *bis* to the 2007 Agreement). Lastly for our purposes, Article 17 *bis*, titled "Social Dimension"—whose text we shall also explore below—expresses the "importance of the social dimension of the Agreement" and recognizes "the benefits that arise when open markets are accompanied by high labour standards." 2010 Protocol art. 4 (adding Article 17 *bis*).

On December 2, 2013, Norwegian Air International Limited ("Norwegian")—an airline that, despite its name, is based in Ireland—applied to the Secretary of Transportation for

a foreign-carrier permit. *See* Application of Norwegian Air International Limited for an Exemption and Foreign Air Carrier Permit, Docket No. DOT-OST-2013-0204-0001 (Dec. 2, 2013), Joint Appendix (J.A.) 1. Shortly thereafter, Norwegian received an Air Operator Certificate and operating licenses from the Irish authorities authorizing it to provide service under the Air Transport Agreement. *See* Letter from Leo Varadkar, Minister, Ireland Department of Transport, Tourism and Sport, to Anthony R. Foxx, Secretary, U.S. Department of Transportation (Feb. 13, 2014), J.A. 254.

Airline-employee unions and others from the United States and Europe, including petitioners here—Air Line Pilots Association, International; Association of Flight Attendants-CWA; Allied Pilots Association; and Southwest Airlines Pilots' Association (the "Unions")—opposed Norwegian's application. In their comments, these opponents claimed that Norwegian, a subsidiary of Norway's flag carrier, used Ireland as a "flag of convenience" by "establish[ing] itself in Ireland to evade the social laws of Norway in order to lower the wages and working conditions of its air crew," including by hiring pilots and cabin crew from a Singaporean third-party contractor. Order to Show Cause, Docket No. DOT-OST-2013-0204-0223, at 3 (Apr. 15, 2016), J.A. 417.

On April 15, 2016, the Secretary issued an order tentatively approving Norwegian's application for a permit. Acknowledging that Norwegian's application and, in particular, its labor practices "present[ed] novel and complex issues," the Secretary nonetheless concluded that neither Article 17 *bis* nor section 41302 allowed the denial of a permit on public-interest grounds where the applicant was qualified, as was Norwegian, and the Secretary was obligated under the Air Transport Agreement to grant the permit "with minimum procedural delay." *Id.* at 7, J.A. 421. In interpreting the Air

Transport Agreement, the Secretary solicited the views of the State Department and the Justice Department's Office of Legal Counsel (OLC), both of which concluded—as had the Department of Transportation's General Counsel—that Article 17 *bis* provides no independent basis for rejecting an otherwise qualified applicant. *Id.* And section 41302, the Secretary explained, allows permit issuance for service that is either authorized under an international agreement or in the public interest. Because the Air Transport Agreement required the United States to grant Norwegian's permit, the Secretary found the former condition satisfied and did not consider the latter. *Id.* at 6–8, J.A. 420–22.

Several months later, the Secretary issued, over the Unions' objection, a final order awarding Norwegian a foreign air carrier permit. Final Order, Docket No. DOT-OST-2013-0204-15123 (Dec. 2, 2016) ("Final Order"), J.A. 569. Reiterating that Norwegian's application was "among the most novel and complex [cases] ever undertaken," the Secretary again concluded that "the law and [the United States'] bilateral obligations leave [the Secretary] no avenue to reject [Norwegian's] application." *Id.* at 3–4, J.A. 571–72. The Unions petitioned for review, and Norwegian intervened on the Secretary's behalf. Before evaluating the merits of the Unions' petition, we must consider the Secretary's argument that they lack Article III standing.

## II.

The "'irreducible constitutional minimum' of standing consists of three elements": "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). This court,

relying on a well-established principle of competitor-standing doctrine that "when [government action] illegally structure[s] a competitive environment . . . parties defending concrete interests . . . in that environment suffer legal harm under Article III," *Shays v. Federal Election Commission*, 414 F.3d 76, 87 (D.C. Cir. 2005), has consistently held that union members have standing to challenge agency action authorizing competitive entry into their employers' markets. In our most recent case, *International Brotherhood of Teamsters v. Department of Transportation*, 724 F.3d 206 (D.C. Cir. 2013), we held that truck-drivers' associations had standing to challenge a Department of Transportation program allowing Mexico-domiciled trucking companies to operate in the United States, because "absent the . . . program, members of these groups would not be subject to increased competition from Mexico-domiciled trucks operating throughout the United States," *id.* at 211–12; *see also Clifford v. Peña*, 77 F.3d 1414, 1416–17 (D.C. Cir. 1996) (holding that maritime unions had standing to challenge a Maritime Administration decision permitting an American carrier to operate foreign-flag vessels); *Autolog Corp. v. Regan*, 731 F.2d 25, 30–31 (D.C. Cir. 1984) (holding that a seamen's union crewing American-flag vessels had standing to seek an injunction against a new foreign cruise line competing on the American vessels' route).

This long line of cases confirms that the Unions have standing here. The Secretary's authorization of Norwegian's entry harms the Unions' members by exposing them to potential job loss, wage and hour cuts, and other competitive pressures. To paraphrase our prior decisions: "[A]bsent [the Secretary's grant of Norwegian's permit], members of [the Unions] would not be subject to increased competition from [a foreign airline] operating [in] the United States." *International Brotherhood of Teamsters*, 724 F.3d at 212. "[T]he potential loss of [Union] jobs [is] a sufficient injury to confer standing,

. . . the injury [is] traceable to [Norwegian]'s expansion, and . . . [the requested relief] would redress the injury." *Clifford*, 77 F.3d at 1416 (citing *Autolog*, 731 F.2d at 31).

Challenging the Unions' standing, the Secretary relies primarily on one case, *Association of Flight Attendants–CWA, AFL–CIO v. Department of Transportation*, 564 F.3d 462 (D.C. Cir. 2009), in which this court held that an airline-employee union lacked standing to challenge the Secretary's award of an air-carrier certificate. But the court did not hold that airline-employee unions could never have standing in such a case nor did it consider our competitor-standing decisions. Rather, the court concluded only that the union had failed to connect the airline's entry to the narrow injury upon which it sought to ground standing, *i.e.* an involuntary furlough, finding that it "[could not] accept [the union's] statements as anything other than conclusory and therefore inadequate." *Id.* at 469. Though arising in a similar context, *Flight Attendants* thus poses no barrier to the Unions' competitor-standing claim here, which relies on a theory of injury and causation well established in our competitor standing case law.

## III.

The Unions challenge the Secretary's grant of Norwegian's permit as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), arguing that it was incompatible with Article 17 *bis* of the Air Transport Agreement and section 41302. Questions of textual interpretation sometimes require courts to struggle with ambiguous language, conflicting context, equivocal history, and elusive purpose. Not so here.

## A.

Starting with the Air Transport Agreement, the Unions argue that Article 17 *bis* provides an independent basis for

denying Norwegian's permit. Our analysis begins—and ends—with the Agreement's text. *See Medellín v. Texas*, 552 U.S. 491, 506 (2008) ("The interpretation of a treaty, like the interpretation of a statute, begins with its text."); *Air Canada v. Department of Transportation*, 843 F.2d 1483, 1486 (D.C. Cir. 1988) ("[W]e interpret [international agreements] according to the principles applicable to treaties . . . .").

Titled "Social Dimension," Article 17 *bis* provides in full:

> 1. The Parties recognise the importance of the social dimension of the Agreement and the benefits that arise when open markets are accompanied by high labour standards. The opportunities created by the Agreement are not intended to undermine labour standards or the labour-related rights and principles contained in the Parties' respective laws.

> 2. The principles in paragraph 1 *shall guide* the Parties as they implement the Agreement, including regular consideration by [a] Joint Committee . . . of the social effects of the Agreement and the development of appropriate responses to concerns found to be legitimate.

2010 Protocol art. 4 (emphasis added).

Article 17 *bis* imposes no specific obligations on the Secretary when considering a permit application. The article's first paragraph sets out a statement of principles—it explains what the parties "recognise" and what the Agreement is "intended" to do—that requires no concrete action from the parties. The second paragraph operationalizes those "principles," doing so by providing that the social dimension of the Agreement "shall *guide*" the parties, prescribing

committee consideration as the only necessary action. The Unions remind us that the word "shall" imposes a mandatory directive. They fail to acknowledge, however, that it also matters what, specifically, the Agreement requires shall be done, namely, that the principles "shall guide the [p]arties." Nothing in Article 17 *bis* requires the denial of a permit that conflicts with the first paragraph's broad statement of principles.

Contrast Article 17 *bis* with other portions of the Agreement. Article 4, for example, provides that "[o]n receipt of applications from an airline . . . [a] Party *shall grant* appropriate authorizations and permissions with minimum procedural delay, provided" that certain conditions are satisfied. 2007 Agreement art. 4 (emphasis added). And Article 6 *bis* requires that, subject to an exception not relevant here, "[u]pon receipt of an application for operating authorisation . . . from an air carrier of one Party, the aeronautical authorities of the other Party *shall recognize* any fitness and/or citizenship determination made by . . . the first Party." 2010 Protocol art. 2. Not only does the language of Articles 4 and 6 *bis* contrast sharply with the aspirational principles of Article 17 *bis*, it directly requires the United States to grant Norwegian's permit "with minimum procedural delay." And Article 4's requirement that before a permit is awarded "the provisions set forth in Article 8 (Safety) and Article 9 (Security) [be] maintained and administered" makes clear that the Agreement can and does require compliance with certain provisions—but notably not Article 17 *bis*—as a precondition to permit issuance.

The government agencies charged with negotiating and interpreting the Agreement agree with us that Article 17 *bis* provides no basis for denying a permit. *Cf. Water Splash, Inc. v. Menon*, 137 S. Ct. 1504, 1512 (2017) (noting that courts give

"great weight" to Executive Branch treaty interpretations and "considerable weight" to the views of treaty counterparties). OLC considered the text, amendment history, and purposes of the Agreement, and concluded that "if an air carrier of a Party to the Agreement is otherwise qualified to receive a permit, Article 17 *bis* does not provide an independent basis upon which the United States may deny the carrier's application for a permit." Interpretation of Article 17 *bis* of the US-EU Air Transport Agreement, 40 Op. O.L.C. 1, 2 (2016). Although OLC found, as have we, the issue sufficiently clear to obviate the need to consider negotiating history, *id.* at 10 n.6, the State Department, "which led the U.S. delegation that negotiated the Agreement," concluded that the relevant history likewise supports our interpretation. Letter from Brian J. Egan, Legal Adviser, Department of State, to Karl Thompson, Principal Deputy Assistant Attorney General, OLC, at 4 (Apr. 13, 2016), J.A. 471. Finally, for good measure, the Secretary consulted the European Commission's Directorate General for Mobility and Transport, whose Director of Aviation confirmed that "if a party has a concern about Article 17 *bis* as a general matter, the only mechanism available under the Agreement is to raise the issue for consideration by the Joint Committee," because Article 17 *bis* "cannot be referred to unilaterally by a Party to refuse an authorization under Article 4 of the Agreement." Notice, Application of Norwegian Air International Limited, Docket No. DOT-OST-2013-0204, at 2–3 (Aug. 4, 2014), J.A. 338–39.

## B.

The Unions next argue that section 41302 allows the Secretary to grant Norwegian's permit only if it is in the public interest. But here, too, the Unions' argument falters in the face of unambiguous text.

Section 41302 describes the conditions under which the Secretary may issue permits to foreign air carriers. We emphasize the key word:

> The Secretary of Transportation may issue a permit . . . authorizing . . . a foreign air carrier if the Secretary finds that—
>
>> (1) the person is fit, willing, and able to provide the foreign air transportation to be authorized by the permit and to comply with this part and regulations of the Secretary; and
>>
>> (2)(A) the person is qualified, and has been designated by the government of its country, to provide the foreign air transportation under an agreement with the United States Government; **_or_**
>>
>> (B) the foreign air transportation to be provided under the permit will be in the public interest.

49 U.S.C. § 41302 (emphasis added). Section 41302 provides two paths to authorization: if the Secretary finds the carrier to be fit, willing, and able under the first paragraph, the Secretary must find *either* that the carrier is qualified and designated by its home country under an agreement with the United States pursuant to paragraph 2(A), *or* that the transportation will be in the public interest pursuant to paragraph 2(B).

The Secretary found, as Union counsel conceded at oral argument, that Norwegian was fit, willing, and able, thus satisfying paragraph one, and that the airline was qualified and designated by Ireland under the Air Transport Agreement, thus

satisfying paragraph 2(A). *See* Oral Arg. 16:18–25. Under the statute's plain text, then, the Secretary could grant Norwegian's permit without engaging in a public-interest analysis under paragraph 2(B) because Norwegian satisfied paragraph 2(A) and the statute unambiguously requires only one "or" the other.

Attempting to convince us that "or" really means "and," the Unions point to the statute's history. Pet'rs' Br. 28–30. In doing so, however, the Unions run afoul of a fundamental principle of statutory interpretation: where the text is unambiguous, as it is here, courts may not look to history. *See United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989) ("[W]here, as here, the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917))).

Even were we to look beyond the statute's text, the evidence the Unions offer works against them. They first cite an earlier version of the statute, which empowered the Civil Aeronautics Board to "issue [a] permit if it finds that [a] carrier is fit, willing, and able . . . *and* that such transportation will be in the public interest." 49 U.S.C. § 1372(b) (1976) (emphasis added). That a prior version of the statute says "and," requiring a mandatory public-interest determination, serves only to underscore the current version's use of "or," evincing Congress's intent to make the public-interest determination a disjunctive condition.

Legislative history likewise demonstrates that, contrary to the impression the Unions give in their brief, Congress's use of the word "or" was far from a thoughtless choice. As a State Department official explained in a Senate subcommittee hearing on the relevant amendment: "The provision will be most helpful in eliminating a dilemma previously faced on

occasion where a service by a foreign carrier was authorized by a bilateral agreement but nevertheless attacked . . . as not being in the 'public interest.' The provision, in effect, creates a conclusive presumption that a service authorized by a bilateral agreement *is* in the public interest." *International Air Transportation Competition Act of 1979: Hearings on S. 1300 Before the Subcommittee on Aviation of the Senate Committee on Commerce, Science and Transportation*, 96th Cong. 101 (1979) (statement of Richard N. Cooper, Under Secretary for Economic Affairs, Department of State). Reinforcing this point at the same hearing, the chairman of the Civil Aeronautics Board presented the Board's view that the proposed amendment "avoid[s] an unnecessary relitigation of the public interest question." *Id.* at 67 (statement of Marvin S. Cohen, Chairman, Civil Aeronautics Board). Congress, then, understood the word "or" to function exactly as we interpret it, establishing a "conclusive presumption" that compliance with an international agreement (under paragraph 2(A)) obviates the need to "relitigat[e]" the public-interest question (under paragraph 2(B)). In other words, "'or' . . . mean[s] . . . well, 'or.'" *Loughrin v. United States*, 134 S. Ct. 2384, 2391 (2014).

Undaunted, the Unions next claim that the Secretary has always engaged in a public-interest analysis as part of the permit-granting process. This argument runs into another fundamental principle of statutory interpretation: that agency practice cannot alter unambiguous statutory text. *See Chevron U.S.A. Inc. v. National Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). Even so, the Unions cite no case where the Secretary found that a permit applicant satisfied section 2(A) yet nonetheless denied a permit on public-interest grounds.

Finally, the Unions argue that even if the Secretary had no obligation to engage in a public-interest analysis before granting a permit, the Secretary should have imposed conditions on Norwegian's permit "required in the public interest." 49 U.S.C. § 41305(b). The Secretary concedes that "the Department of Transportation did not expressly address [the Unions'] request" for permit conditions. Resp't's Br. 33. As the Final Order makes clear, however, Norwegian voluntarily agreed to certain steps to address "concerns regarding [its] potential hiring and employment practices," Final Order at 4, J.A. 572, which the Secretary took into account in awarding the permit, *see id.* at 5, J.A. 573 ("In reaching our decision to grant [Norwegian's] permit, we have taken into account the totality of the record . . . including those changes to its hiring and employment practices that it has offered as a direct result of the difficult issues that have been raised during the course of this proceeding."). This, we think, means that the Secretary thought no further conditions were necessary. *See NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969) (plurality opinion) (finding remand unnecessary where it "would be an idle and useless formality").

## IV.

After traversing the landscape of international-agreement and statutory interpretation, we end where we began: with the text. Broad statements of principle cannot create binding obligations and when a statute requires "(A) or (B)," (A) is enough. For the foregoing reasons, the petition for review is denied.

*So ordered.*

ROGERS, *Circuit Judge*, concurring: I concur that the Unions have Article III standing to challenge the decision of the Secretary of Transportation approving the permit application of Norwegian Air International Limited to fly between the United States and foreign countries. Op. at 5-7. I also concur that the plain text of 49 U.S.C. § 41302(2)(B) did not require the Secretary to make a "public interest" finding in approving the permit application. Op. at 10-13. Although I concur that Article 17 *bis* of the Air Transport Agreement does not provide an independent basis for denying a permit application, Op. at 7-10, I write separately to clarify that Article 17 *bis* has both an immediate role in the permit approval process, through the Secretary's consideration of a permit application and imposition of terms for service under a permit, and a continuing role once a permit becomes operational, through (at least) action by the referenced Joint Committee.

The preamble to the Air Transport Agreement between the United States and the European Community states that the Agreement was intended not only to promote competition among airlines, but also to ensure that "all sectors of the transport industry, including airline workers," would "benefit" under the new "liberalized" regime. 2007 Agreement pmbl. The 2010 Protocol amending the Agreement added Article 17 *bis*. Article 17 *bis* consists of two paragraphs: The first paragraph states that "[t]he opportunities created by the Agreement are not intended to undermine labour standards or the labour-related rights and principles contained in the Parties' respective laws." 2010 Protocol art. 4. The second paragraph implements the first, instructing that "[t]he principles in paragraph 1 shall guide the Parties as they *implement* the Agreement, *including* regular consideration by the Joint Committee" of the Agreement's "social effects." *Id.* (emphases added).

Based on its plain text, Article 17 *bis* can provide a basis for imposing conditions in connection with the Secretary's consideration of an application for a permit and thereafter, if an application is approved pursuant to the Secretary's authority under 49 U.S.C.§ 41305(b) to "impose terms for providing foreign air transportation under the permit." The reference to "implement" in paragraph 2 can encompass both the Secretary's consideration of a permit application and the terms of the permit to be issued pursuant to approval of the application. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1961) (defining "implement" as "to give practical effect to and ensure of actual fulfillment by concrete measures"); OXFORD ENGLISH DICTIONARY (2 ed. 1989) ("[T]o complete, perform, carry into effect (a contract, agreement, etc.)"). Additionally, given that "[t]he participle *including* typically indicates a partial list," BLACK'S LAW DICTIONARY 777 (10th ed. 2014), the use of "including" in paragraph 2 indicates that the Joint Committee is not the only mechanism for vindicating "high labour standards" and "labour-related rights." Indeed, the Secretary's action in the instant case accords with this interpretation. It is undisputed that the Secretary has authority to impose terms for providing service under the permit and did so here. And in considering Norwegian Air's application for a permit, the Secretary expressly relied on voluntary commitments made by its Chief Executive Officer. Dep't of Transp. Final Order 2016-11-22 at 4-5 & n.17 (Dec. 2, 2016) ("Final Order"); Letter of Bjorn Kjos, Chief Exec. Off'r., Norwegian Air, Ex. 1 to Mot. of Norwegian Air Int'l Ltd. for Leave to File and Expedited Treatment, DOT-OST-2013-0204-0203 (June 1, 2015).

During the Department of Transportation's consideration of Norwegian Air's application for a permit, the Unions requested conditions be placed on Norwegian Air's permit "to ensure that its operations are consistent with Article 17 *bis*";

"[t]hese conditions could include that [Norwegian Air's] aircrew will (1) be based in Ireland; (2) be employed on contracts with an Irish company that will be governed by Irish employment and social security laws; and (3) have the right to choose a representative for collective bargaining purposes." Objection of Labor Parties to Order to Show Cause, DOT-OST-2013-0204-13281 (May 16, 2016) at 38. The Unions now contend that the failure to place these terms on Norwegian Air's permit was arbitrary and capricious, specifically that "[b]y failing to address their requested conditions at all, much less whether such terms would be consistent with the intent expressed in Article 17 *bis*, DOT failed to address 'an important aspect of the problem.'" Pet'rs' Br. 33-34 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

The Secretary acknowledges that the "Department of Transportation did not expressly address petitioners' request" for conditions, Resp't's Br. 33, but maintains that the concerns underlying the Unions' conditions were addressed during the Department's consideration of Norwegian Air's application. *Id.* at 40-41. In fact, the administrative record makes clear that the serious and sensitive labor issues of concern to the Unions were explored and that considerable attention was focused on Norwegian Air's business model and its potential impact on airline employees. Final Order at 4; *see, e.g.,* Answer of Allied Pilots Ass'n to Application of Norwegian Air Int'l Ltd., DOT-OST-2013-0204-0006 (Dec. 20, 2013); Reply of Norwegian Air Int'l Ltd., DOT-OST-2013-0204-043 (Feb. 21, 2014). In granting the permit application, the Secretary considered "the totality of the record." *Id*. at 5. Further, to the extent the Unions were concerned that Norwegian Air would hire through employment agencies under contracts "governed by the laws of a country other than the carrier's licensing country" and deprive its employees of a "collective say over their wages and

working conditions," Joint Reply Comments of Air Line Pilots Ass'n, DOT-OST-2013-0204-0161 (Aug. 25, 2014) at 10-11, the Secretary's reliance and expectation Norwegian Air would implement its voluntary commitments, consistent with law, suggests these concerns underlying the Unions' requests were considered.

Although it cannot be gainsaid that the Secretary should have explained his reasons for not including the Unions' timely and germane conditions in the permit, *cf. BNP Paribas Energy Trading GP v. FERC*, 743 F.3d 264, 270 (D.C. Cir. 2014), this is not a case where the Secretary "entirely failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43. Nor do the Unions make that precise argument, instead focusing on the Secretary's failure to consider their requested permit conditions. *See* Pet'r's Br. 33-34. Under the circumstances, the Unions' immediate objection to non-inclusion of their conditions as terms in Norwegian Air's permit fails. But there remains another avenue by which the Unions can potentially obtain additional protections for labor interests and rights during the operational phase of the permit — by requesting action by the Joint Committee, *see* 2010 Protocol art. 4, para. 2.

SENTELLE, *Senior Circuit Judge*, concurring: Because I agree with the majority that the standing question in this case is governed by controlling precedent in *International Brotherhood of Teamsters v. U.S. Department of Transportation*, 724 F.3d 206 (D.C. Cir. 2013), I concur in the opinion of the court. Because I disagree with the *International Brotherhood* opinion, I write separately to express my belief that if we were writing on a clean slate, we should dismiss for want of standing rather than denying the petition on its merits.

Both *International Brotherhood* and the present case depend on the application of our competitor standing precedents. I have no problem with the proposition that the competitors of a regulated entity have standing to challenge the application or relaxation of regulations affecting their competitor. My difficulty is that neither the union in *International Brotherhood* nor the union in the present controversy is a competitor of the regulated entity. Unions do not compete with airlines. Airlines compete with airlines.

Although the majority today, relying on *International Brotherhood* and earlier cases, asserts that the actions of the government cause putative harm to the petitioner, this does not appear to me to be the case. The possible future harm to the union members in each instance is caused, not by the actions of the government, but by the actions of a third party who is not the competitor of the petitioner. *Cf. Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992).

But, again, we do not write on a clean slate, and given the precedential force of the case decided by the court, I join the court's decision.